# COMMERCIAL SECURITY BANK OF OGDEN
## v. JOHNSON et al.

No. 6927.   Decided October 5, 1946.   (173 P. 2d 277.)

See 66 C. J., Vendor and Purchaser, sec. 318; 12 Am. Jur., 855.

*Moyle & Moyle,* of Salt Lake City, for appellant.

*Joseph E. Evans,* of Ogden, for defendants.

*Howell, Stine & Olmstead,* of Ogden, for respondents.

WOLFE, Justice.

Appeal by the Intermountain Solvents Company in an interpleader action.

As revealed by the title there are three sets of parties: (1) the plaintiff bank, hereinafter called the "Bank"; (2) the defendant Solvents Company, hereinafter called the "Company", Johnson and Fitzgerald, hereinafter called "Buyers"; and (3) the defendant Ward Corporation, Beus and Jensen, as successive bishops of the Ward, hereinafter called "Seller" or "Ward".

The Bank, holder of various documents and moneys as escrow agent of the defendants, brought this action in interpleader to be discharged and released of liability in reference thereto. The lower court released the bank from further liability upon its depositing the documents and moneys with the clerk of the court. None of the defendants complain of this part of the lower court's judgment.

After the discharge of the Bank the case developed into a contest between the Company and the Buyers on one side and the Seller on the other. The Seller contends that by a contract made between it and the Buyers on December 12, 1939, the Buyers were to commence construction of an industrial alcohol distilling plant by a certain date, to complete it and put it into operation as part of the consideration for certain premises thereby sold to the Buyers by the Seller for that purpose. It contends that the Buyers did not start the plant in the time specified and that they did not built the plant as agreed, and that, therefore, under the terms

of the contract, it is entitled to a reconveyance of the premises together with $200 "earnest money" and the rents collected by it both before and after it had desposited the "repurchase" price with the Bank as required by the contract. The nature of these contentions will appear more clearly as the facts are set forth.

The Buyers and Company (the successor in interest to the Buyers) admit the sale contract but contend that they commenced construction of the plant as agreed or if they did not commence construction on time the Seller waived that dedauft or is estopped from asserting it. Further, they admit the plant was not constructed and put into operation but contend that their financial difficulties and wartime conditions prevented that construction and that they are not in default because a reasonable time for such construction under the circumstances has not yet passed and, therefore, that the Seller is not entitled to the reconveyance of the property or to the $200 "earnest money" but, on the contrary, must respond to them with damages for unlawfully taking and detaining the premises from them. They assert that if they are held to be in default in that they did not commence construction on time or did not build as agreed so that the Seller is entitled to a reconveyance of the premises and the "earnest money", that the Seller unlawfully and wrongfully took possession of the premises some six months before it deposited the repurchase price with the Bank. They assert that the deposit of the repurchase price was required by the contract before the Seller was entitled to the reconveyance and that therefore they are entitled to the reasonable rental value of the premises from the Seller for the approximately six months from the time the Seller repossessed the premises until it deposited the repurchase price with the Bank. The reason for these contentions will appear more clearly when the facts are understood.

The trial court found, in part, that the plant was not commenced within the time agreed and that the plant was not constructed as provided for in the contract. It found that the Seller rightfully and lawfully took possession of the premises

some six months before it, the Seller, deposited the repurchase price with the Bank. It decreed to the Seller the premises, the $200 "earnest money" and all rents received by it both before and after its deposit of the repurchase price with the Bank. As to this part of the findings and decree of the lower court the Company appeals.

The important facts preceding the suit are as follows:

On December 12, 1939, the Company's predecessors in interest, defendants Johnson and Fitzgerald, that is, the Buyers, entered into a "Memorandum of Agreement" with the Ward, that is, with the Seller, in reference to a Ward-owned warehouse building and the ten acres of land on which the warehouse was located.

The pertinent parts of that agreement are as follows:

"It is understood and agreed between the parties hereto that the Buyers are contemplating the construction and operation of an industrial alcohol manufacturing plant, to be owned and controlled by a corporation under process of organization by the Buyers and their associates; that the Buyers are interested in the hereinafter described property and premises as a possible location for such plant, subject to approval of engineers, satisfactory water analysis and water supply, and transportation facilities.

"In consideration of One Dollar ($1.00), paid by the Buyers to the Seller, the receipt of which is hereby acknowledged, and in consideration of the agreements hereinafter set out, the Seller hereby sells to the Buyers for the sum of Twenty-Two Hundred Fifty ($2,250) Dollars, lawful money of the United States of America, and the location of said industrial alcohol manufacturing plant on said property, the following described real estate, situated in Weber County, State of Utah, to wit:

[description of the property]

\*  \*  \*  \*  \*  \*

"This Agreement shall be placed in escrow forthwith with Commercial Security Bank, Ogden, Utah, and the Seller hereby agrees to deposit with said escrow agent said Warranty Deed and Abstract of Title within four days after written notice by the Buyers that said property has been approved by the Buyers for the location of said plant, which notice shall be given within ten days after the 60 day period granted for said investigations as to water supply, etc. A copy of said written notice shall be deposited with said escrow agent, and the Seller hereby instructs the said escrow agent to deliver said deed

to the Buyers upon receipt of the sum of Twenty Hundred and Fifty ($2,050) Dollars, lawful money of the United States of America and their written notice of their intention to accept said property for the location of said industrial alcohol manufacturing plant, together with a deposit of the sum of Two Hundred ($200) Dollars, cash, to be forfeited to the Seller if the Buyer shall not commence construction of such plant on or before June 1, 1940, otherwise to be returned to Buyers at once, together with a written agreement to reconvey said property to the seller for the sum of Twenty Hundred and Fifty ($2,050) Dollars lawful money of the United States of America, if the Buyers shall fail to commence construction within the time specified. The Buyers shall likewise place in escrow a warranty deed conveying such premises back to the Seller in the event that the Buyers shall fail to construct such plant, to be delivered to the Seller upon the receipt by the escrow agent, for the use and benefit of the Buyers, of the said sum of Twenty Hundred Fifty ($2,050) Dollars.

"Seller grants Buyers a period of Sixty days from date hereof to make preliminary investigations as to water analysis, water supply, transportation facilities and to some Engineer's approval * * *"

On February 21, 1940, the time for the Buyers to give notice of acceptance was extended to the 5th day of May, 1940.

On May 18, 1940, the Buyers gave the following "Escrow Instructions" to the Bank:

"Pursuant to the written notice served upon you under date of March 5, 1940, by the undersigned, we this day deposit with you the sum of twenty-two Hundred Fifty ($2,250.00) Dollars, which is the purchase price of the property described in that certain contract between J. Levi Beus, as Bishop of Hooper Ward, Weber Stake, Church of Jesus Christ of Latter-Day Saints, and E. J. Johnson and R. D. Fitzgerald. Upon delivery to the undersigned of the deed conveying the said property in accordance with the terms of said contract, you will deliver to the said J. Levi Beus, as Bishop of Hooper Ward aforesaid, Twenty Hundred Fifty ($2050.00) Dollars of said money, the other Two Hundred ($200.00) Dollars to be retained by you as earnest money, as per the terms of said contract.

"The undersigned are this day depositing with you a Warranty Deed from E. J. Johnson and Winifred C. Johnson, his wife, conveying said property to Hooper Corporation of the Church of Jesus Christ of Latter-Day Saints. You are instructed that if on or before June 1st, 1940, construction of an industrial alcohol plant on the property described in said contract and in said deed has not been commenced, to deliver said

deed to Bishop J. Levi Beus, for and on behalf of said Hooper Corporation of the Church of Jesus Christ of Latter-Day Saints, upon deposit with you of $2,050.00 to be delivered to E. J. Johnson. On the other hand, if construction work has commenced on or before June 1, 1940, said deed is to be returned to the undersigned. If construction work has commenced on or before June 1, 1940, the Two Hundred ($200.00) Dollars earnest money above referred to shall be delivered to J. Levi Beus to make up the balance of the purchase price of Twenty-two Hundred Fifty ($2,250.00) Dollars. On the other hand, if construction work has not commenced by said date, then said earnest money shall be forfeited in accordance with the terms of said contract.

"Dated this 18th day of March, A. D. 1940.

"(Signed) E. J. Johnson
"(Signed) R. D. Fitzgerald."

The Buyers executed a deed, hereinafter referred to as the "Johnson deed," reconveying the premises to the Seller and delivering it to the Bank with the above-quoted "Escrow Instructions."

The Bank delivered to the Buyers the deed from the Seller; to the Seller the $2,050 and retained the $200 "earnest money" and the Johnson deed naming the Seller as grantee.

The overall picture of events following the delivery of the Seller's deed to the Buyers and the payment of the money to the Seller is as follows: The Buyers took possession of the premises and did various acts in relation to starting to build the plant. The defendant Company was organized on June 21, 1940 by the Buyers and others. The Buyers assumed respectively the offices of President and General Manager of the Company. All rights of the Buyers in the contract with the Seller and in the premises were transferred to the Company. The alcohol plant was never constructed. Finally in October, 1943, the Seller rented the premises to a third party. On May 11, 1944, the Seller deposited $2,050 with the Bank and demanded the Johnson deed and the $200 "earnest money." This lawsuit followed.

The most important question in this case is: Was the Seller entitled to the Johnson deed reconveying to it the premises when on May 11, 1944 it deposited the $2,050 with the Bank?

The contract in this case required the Buyers to pay a sum of money and to start and complete the construction of an alcohol plant. It is clearly apparent that the construction and operation of an industrial alcohol manufacturing plant on the premises involved was an important and material part of the consideration for the sale. The contract did not specify the time in which the plant was to be constructed and put into operation. The law implies (as all parties agree) that the plant was to be constructed and put into operation within a reasonable time. A "reasonable time" has been defined as:

> "So much time as is necessary, under the circumstances, to do conveniently what the contract or duty require should be done in a particular case." *Henderson* v. *Daniels*, 62 Mont. 363, 205 P. 964, 967.
>
> "So much time as is necessary, for a reasonably prudent and diligent man to do, conveniently, what the contract or duty requires should be done, having a regard for the rights and possibility of loss, if any, to the other party to be affected." *Davis* v. *Godart*, 147 Minn. 362, 180 N. W. 239, 240.

The question then is: Considering all the facts and circumstances of this case, was 3 years and 11 months (June 1940-May, 1944) more than sufficient time for a reasonably diligent and prudent man to conveniently construct the alcohol plant contemplated by the parties to the December 12, 1939 contract?

The "facts and circumstances" which have a bearing on this question in addition to those already mentioned are as follows:

Various attempts to finance the venture were made. One scheme was to sell stock, another was to finance by contracts with potato growers of Box Elder County and the third was to borrow from a bank. For various reasons, none of the financing plans materialized.

According to the record, in early 1941 the United States Government "froze" certain of the materials needed for the manufacture of the alcohol distilling equipment. On June 3, 1941, priorities were placed upon alcohol processing equip-

ment. The company attempted to obtain the necessary priorities for such equipment and sent a representative to Washington, D. C., to arrange for same. No priorities were obtained.

The appellant Company argues that because of these facts a reasonable time has not yet passed for the construction of the plant. Quoting from its brief on pages 31, 32:

"We further submit that the evidence in this case definitely and conclusively establishes that the Defendants Johnson and Fitzgerald, and the Appellant Company after its organization, in good faith proceeded with diligence the attempt to complete the construction of the plant. *The completion of the plant was delayed first by reason of difficulties encountered in the financing thereof*, as more specifically stated in the statement of facts, and then by the U. S. Government Freezing Order on copper and other necessary equipment, and then by the placing of priorities upon alcohol distilling equipment. From the date of the freezing of said materials in the early spring of 1941 to the date of the trial of this action it was wholly impossible, due to the war conditions and the impossibility of obtaining necessary priorities, to complete the plant." (Italics added.)

As shown by the italicized portion of the above quotation the completion of the plant was prevented by reason of difficulties in the financing thereof. Fitzgerald testified that the equipment supplier sold alcohol manufacturing equipment to other parties during those financing difficulties and the inference is that had the Company been financially responsible it could have procured the necessary equipment for this plant before any freezing and priority orders were imposed on such equipment.

The Seller and the Buyers did not contract in reference to the financing of the venture. It is apparent that the Seller assumed the Buyers were able financially to start and complete the plant and to put it into operation. The contract provided that construction should be started on or before June 1, 1940, which was less than 30 days after notice that the site was acceptable was given the Seller. Ordinarily when a date for commencement of construction is set the parties intend that the construction

will be continued until completion. As revealed by the record the reason the Seller was interested in the construction and operation of the plant was to provide employment for the people living in that vicinity. That purpose was well known to the Buyers. That purpose could be fulfilled only by the construction of the plant and putting it into operation in a short time and not years later. Clearly the construction of this plant was not expressly or by implication made conditional upon successful sale of stock in the Company to be formed, or the possibility of arranging a loan or of selling some scheme to farmers. The financial difficulties of the Buyers and of the Company were not caused by the Seller. Time lost by such internal troubles of the Company and personal difficulties of the Buyers was time taken from the reasonable time allowed the Buyers and Company to fulfill their part of the contract. The financial difficulties are immaterial so far as determining what was a reasonable time for performance of the contract.

The record shows that had the Company been financially sound enough to support the venture it could have conveniently secured the equipment for the plant before the freezing orders and priorities were imposed thereon. The lack of the distilling equipment delayed the construction. The construction of the physical structure of the plant, that is, the plant less the equipment, was not shown to have been "frozen" or prevented by the imposition of governmental controls. It is a fair inference that if the Company had had the alcohol distilling equipment before the freezing orders the remainder of the plant could have been completed after said orders.

It is our opinion that under all the circumstances of this case more than a reasonable time for the completion of the plant had passed by May 11, 1944 when the Seller deposited the $2,050 with the Bank and demanded ■ the reconveyance of the property. As to what would be the result had the delay in construction been caused solely by governmental freezing orders and priority control we express no opinion.

The Company contends that the Seller should be estopped from obtaining the Johnson deed reconveying the premises *and* that the Seller waived the construction of the plant within a reasonable time.

The facts upon which these contentions are made are that as late as the fall of 1941 the Seller recognized that the Buyers or the Company had some interest in the premises by consulting the Company in reference to a right of way across the land. Further, the Seller for several years took no action to recover the premises and because of that the Company and the Buyers paid the taxes on the premises for the years 1941-1944, inclusively, went to considerable expense for architect's fees, travel expenses for equipment suppliers to inspect the premises, fees and expenses for its attorney to try to get priorities, and various other expenses in an attempt to get the plant started.

We find no estoppel. Nor do we think the Seller waived the construction of the plant within a reasonable time. The record is replete with testimony that the Seller at all times insisted upon the construction of the plant and its agents several times objected to the lack of speedy construction thereof.

If it is true that the Seller recognized the Company had an interest in the premises as late as the fall of 1941, that would be expected. The Company did have an interest in the premises at that time; it had the legal title and the right to the use of that property. The Company or the Buyers paid the taxes—the contract did not specify who was to pay the taxes; so long as the Buyers or the Company had the right to the use of the premises and the rents and profits therefrom it or they were responsible for the taxes. The Buyers and the Company went to an expense to get the plant constructed—the contract called for the construction and operation of an industrial plant; it was expected by all concerned that expenditures would be made in an effort to build that establishment.

We are of the opinion that on May 11, 1944 when the Seller deposited the $2,050 with the Bank for the Buyers

it was entitled to the Johnson deed reconveying the premises to it.

The next question is: Who is entitled to the $200 "earnest money"?

The contract between the Buyers and the Seller is ambiguous as to this $200. In one clause the $200 appears to be a refund of the purchase price to "be returned to Buyers at once" if the plant is commenced on or before June 1, 1940. In another part of the agreement it appears to be liquidated damages to be given the Seller in case the plant is not commenced on June 1, 1940 or constructed at all and the Seller desires to "repurchase" the property by paying $2,050 to the Bank for the Buyers.

Though the "Escrow Instructions" delivered by the Buyers to the Bank are not binding on the Seller they show what the Buyers intended to be done with the $200. It is clear from those instructions that the parties intended that if construction was commenced on or before June 1, 1940 the $200 was to be delivered to the Seller "to make up the balance of the purchase price" of $2,250. The $200 was not intended to be a rebate to the Buyers if they started construction by June 1, 1940. In case construction was not commenced by June 1, 1940 or the plant was not constructed and the Seller elected to take the property back, the $200 was to be "forfeited" to the Seller; that is, the repurchase price was $200 less than the purchase price.

It is unnecessary for us to determine whether or not the construction of the plant was commenced on or before June 1, 1940 or if not so commenced whether the Seller waived that date for the commencement of construction. The arrangements between the Buyers and the Seller provided that if work was started on or before June 1, 1940 the $200 went to the Seller as "the balance of the purchase price." If work was not commenced on or before June 1, 1940 the $200 was to be "forfeited" to the Seller. In either event, on June 1, 1940 the Seller became entitled to the $200. It was still entitled to that sum on May 11, 1944

when it undertook to exercise its election to recover the premises by paying the $2,050 to the Bank for the benefit of the Buyers.

The last question is: Who is entitled to the rents received by the Seller from renting the premises to third parties during the period of October, 1943 to May 11, 1944?

The parties to the December 12, 1939 contract expressly provided that the Johnson deed reconveying the premises to the Seller was not to be delivered by the Bank to the Seller unless and until the Seller deposited the "repurchase" price of $2,050 with the Bank for the benefit of the Buyers. The clear intent of the parties was that until the $2,050 was deposited by the Seller all rights to use and profit from the premises were the Buyers' or their successors in interest.

The record reveals that during the period of October, 1943 to May 11, 1944, the Seller at various times rented the premises to third parties and collected therefrom rents. Such taking control of the premises by the Seller was not authorized by the terms of the agreement and the facts and circumstances of the case. As the Company was entitled to all rents and profits and the use of the premises until the $2,050 was deposited for their benefit with the Bank, it follows that all rents collected by the Seller before said deposit was made belong to the Company. The record does not show that the Seller itself made any use of the premises except with the consent and approval of the Buyers or the Company. The Seller is chargeable only for the rents it received from renting the premises before May 11, 1944 and not for the reasonable rental for that period or other periods when the premises were either not being used by anyone and so available for the use of the Company or when used by the Seller with the consent and approval of the Buyers or the Company.

The case is remanded to the trial court with instructions to modify its decree so as to give the Company the rents received by the Seller from its rental of the property before May 11, 1944. If the amount of said rents has not been de-

termined the court to take evidence to ascertain the amount. No costs allowed.

LARSON, C. J., and McDONOUGH, PRATT, and WADE, JJ., concur.